UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Sherrill Bonder Rothberg,

                        Plaintiff,

        - against -

Chloe Foods Corporation, a/k/a Chloe
Food Manufacturing, *et al*,

                        Defendants.

----------------------------------------X

CV-06-5712
(CPS)

MEMORANDUM
OPINION AND
ORDER

SIFTON, Senior Judge.

        Plaintiff Sherrill Bonder Rothberg commenced this action in

October 2006 against corporate defendants Chloe Foods

Corporation, a/k/a Chloe Foods Manufacturing; Chloe Foods, Inc.,

d/b/a Blue Ridge Farms, Inc.; Chloe Foods S.A.; BRF Acquisition,

LLC; 3301 Atlantic Avenue, LLC; Greenvale Financial Center, Inc.;

Anperg, Inc.; and Blue Ridge Farms (Illinois), Inc. (the "Chloe

Defendants"); and against individual defendants Thomas

Kontogiannis; Annette Apergis; Nick Tisinenkias; Jeffrey Siegel;

Richard Siegal; and June Siegal both individually and in her

capacity as personal representative of the estate of Seymour

Siegel (the "Individual Defendants").[1]

        According to plaintiff, defendants have defrauded her in

order to avoid payment of a debt owed by Blue Ridge Farms, Inc.

---

[1] The Complaint also names as defendants John and Jane Does 1 through
10 and ABC Corporations 1 through 10, though there are no allegations in the
Complaint directed at these unidentified defendants.

("Blue Ridge Farms") and of a judgment[2] subsequently obtained

pursuant to that debt.  Specifically, plaintiff claims that (1)

Kontogiannis, Apergis, Jeffrey Siegel, and Richard Siegel (the

"RICO defendants") fraudulently transferred the assets of Blue

Ridge Farms through a pattern of racketeering activity in order

to avoid their obligation to plaintiff and other creditors, in

violation of RICO, 18 U.S.C. § 1962 *et seq.*;[3] (2) the Chloe

Defendants became successors to Blue Ridge Farms and are liable

for its debts;[4] (3) all defendants fraudulently transferred

assets in violation of New York Debtor and Creditor Law §§ 273,

274, 275 and 276; (4) all defendants breached their contractual

obligations to plaintiff; (5) the Individual Defendants breached

their fiduciary duties to plaintiff; and (6) all defendants

unjustly enriched themselves at the expense of plaintiff.[5]  Now

before this Court are (1) the non-RICO defendants' motion to

---

[2] In an action filed in this district, plaintiff was awarded a default judgment in the amount of $915,833.32 against Blue Ridge Farms. *See Rothberg v. Blue Ridge Farms, Inc.*, 04-CV-3986.

[3] This is the only basis for federal jurisdiction in this matter. Diversity jurisdiction is not available since both plaintiff and June Siegel are Florida residents.

[4] This appears to be stating a claim to enforce the previous judgment against the alleged successor corporations of Blue Ridge Farms.

[5] The Complaint also lists a claim titled "claim for piercing the corporate veil/alter ego."  However, this appears not to be an independent cause of action but rather a theory of liability as to why the Individual Defendants should be liable for any judgment against the Chloe Defendants on the remaining causes of action. *See 9 East 38th Street Associates, L.P. v. George Feher Associates, Inc.*, 640 N.Y.S.2d 520, 521 (N.Y.App.Div. 1996) ("a separate cause of action to pierce the corporate veil does not exist independent from the claims asserted against the corporation.").

dismiss for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1); (2) all defendants' motion to dismiss for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6); and (3) plaintiff's motion for partial summary judgment, pursuant to Fed. R. Civ. P. 56.[6]  For the reasons stated below, defendants' motions to dismiss are denied and plaintiff's motion for partial summary judgment is also denied.

## Background

The following facts are taken from plaintiff's Amended Complaint (the "Complaint"),[7] the submissions of the parties in connection with these motions, and oral arguments held before the undersigned.[8]  Disputes are noted.

*Blue Ridge Farms*

Blue Ridge Farms, which sold prepared food products to supermarkets and other retail outlets, was founded in 1960 by Seymour Siegel.  Prior to March 2004, Blue Ridge Farms was a family business, controlled by the Seymour Siegel, his wife June

---

[6] At my request, the parties have also briefed the jurisdictional question, discussed below.

[7] Plaintiff amended her Original Complaint after defendants filed a motion to dismiss which noted certain flaws in the Original Complaint, in particular, the fact that plaintiff had failed to allege any predicate RICO acts under 18 U.S.C. § 1961(1).

[8] Defendants have not yet filed an Answer.

Siegel, and their sons Jeffrey and Richard Siegel; Seymour served as Chief Executive Officer ("CEO"), June was Corporate Secretary and Treasurer, Jeffery was President and Chief Financial Officer ("CFO"), and Richard was Chief Operating Officer ("COO"). The company's main operations were conducted at a manufacturing facility located at 3301 Atlantic Avenue in Brooklyn, New York. An affiliated entity owned entirely by Jeffery and Richard Siegel and known as Blue Ridge Farms (Illinois) owned a processing and warehouse facility in Park Forest, Illinois. Blue Ridge Farms also maintained sales and distribution facilities in Florida[9] and there were other affiliated entities, not specified in the Complaint, also owned by the Siegel family.[10]

*Plaintiff's Loans*

Plaintiff is a friend of the Siegel family and loaned money on multiple occasions to Blue Ridge Farms, beginning in 1991. In

---

[9] It is not clear from the Complaint if the Florida facilities were owned by the Siegels or Blue Ridge Farms or if they were leased.

[10] According to plaintiff, these different entities were "for all intents the same" as Blue Ridge Farms and these "affiliated entities would . . . funnel funds back and forth without regard to proper accounting and without any expectation that those transfers would be repaid."

According to the Complaint, Blue Ridge Farms had gross annual sales of around $60 million in 2002, and Blue Ridge Farms and its affiliates had the following assets in 2004: The Atlantic Avenue property, valued at $2.5 million for the land and $18.5 million for improvements; the Illinois property, valued at $3.3 million; machinery at the Atlantic Avenue property valued at $16.8 million; furniture and fixtures and other equipment at the Atlantic Avenue property valued at $1.6 million; trucks valued at $1.3 million; and other assets of indeterminate value, such as accounts receivable and intellectual property.

January 2004, June Siegel asked plaintiff to make an additional
loan and plaintiff loaned the company an additional $30,000,
bringing the total outstanding loans made by plaintiff to
$830,000.[11]

That same month, Blue Ridge Farms allegedly defaulted on
interest payments due to plaintiff.  On March 9, 2004, Seymour
Siegel, on behalf of Blue Ridge Farms, executed a promissory note
in favor of plaintiff in the principal amount of $830,000, which
replaced all prior notes.  This note was payable "on demand."[12]
On June 30, 2004, Blue Ridge Farms repaid the $30,000 loan of
that year but still had an outstanding debt to plaintiff of
$800,000 plus accrued interest.  On July 15, 2004, Blue Ridge
Farms paid plaintiff $4,166.68 for interest due on the loan,
though, according to plaintiff, that amount did not cure the
outstanding interest due.  On August 18, 2004, plaintiff advised
Blue Ridge Farms that it was in default of the loans and demanded
immediate repayment of all amounts due.[13]

Blue Ridge Farms did not make any subsequent payments to
plaintiff and on September 14, 2004, plaintiff commenced suit

---

[11] As described in more detail below, Blue Ridge Farms was experiencing
financial problems and efforts were being made to sell the company, but
plaintiff was not informed of these developments.  However, plaintiff's
counsel confirmed during oral argument on these motions that plaintiff does
not allege that there was any fraud involved in the solicitation of these
loans.

[12] There is no allegation of fraud with regards to that note.

[13] At that time, plaintiff was unaware of the fact that Kontogiannis was
in control of Blue Ridge Farms, as described below.

against Blue Ridge Farms in this district to recover the
outstanding amounts due.  According to plaintiff, Blue Ridge
Farms eventually conceded that it owed plaintiff the money but
also produced a new and fraudulent promissory note with a
maturity date of December 31, 2005 (the "New Note"), at which
point Blue Ridge Farms alleged that plaintiff was not entitled to
be repaid until that date.[14]  A copy of that fraudulent note was
provided to the district court at an unknown date during the
litigation[15] and was sent by fax to plaintiff on December 13,
2004.

According to plaintiff, Blue Ridge Farms then engaged in a
series of stalling tactics, such as requests for extensions of
discovery deadlines and adjournments until July 2005, at which
point Blue Ridge Farms informed the district court that it no
longer wished to defend itself in the action.  After further
delays caused by Blue Ridge Farms failure to cooperate, the court
entered a Final Judgment of Default in favor of plaintiff in the
amount of $915,833.32 on August 31, 2005.  According to
plaintiff, she is now unable to collect on that judgment because
of the "scheme" described below which allowed the Chloe

---

[14] It is reasonably inferred from the Complaint that plaintiff believes
the fraudulent note was a stalling tactic to delay the resolution of
litigation until the point where Blue Ridge Farms had no assets remaining from
which judgment could be recovered.

[15] A review of the record of that case indicates that Blue Ridge Farms
referred to a note with a due date of December 31, 2005 in their Answer to the
Complaint in that action, submitted October 22, 2004.

Defendants to foreclose on the assets of Blue Ridge Farms in January 2007 and lock out the legitimate creditors such as the plaintiff.  As a result, plaintiff's loan to Blue Ridge Farms and the subsequent judgment are now "valueless and uncollectible."

*2004 Stock Sale to Kontogiannis*

In February 2004, Jeffrey and Richard Siegel met with Thomas Kontogiannis to pursue a possible sale-leaseback arrangement with the Atlantic Avenue property.[16]  During these discussions, Kontogiannis realized that Blue Ridge Farms would be a good platform through which he could sell olives and olive oil from plantations he owned in Greece and he thereafter offered to acquire a 51% interest in the Atlantic Avenue property, with Jeffrey and Richard Siegel owning the remaining 49%, and a 49% interest in Blue Ridge Farms, with Jeffrey and Richard Siegel retaining the remaining 51%.[17]  As part of the deal, Seymour and June's shares in Blue Ridge Farms would be sold to Kontogiannis. The total cost to Kontogiannis of this deal was $31 million, including Kontogiannis's agreement to assume responsibility for the "sub-debt," which refers to loans made by family and friends

---

[16] The Siegels were trying to raise money for Blue Ridge Farms' operations and were also under pressure to repay an $18 million loan from HSBC Bank.

[17] Apparently the property was owned by Blue Ridge Farms and the deal offered by Kontogiannis would result in splitting the property from the company.

of the Siegels' to the company (including the loans made by
plaintiff).[18]  Pursuant to this offer, Seymour and June Siegel
would receive $4.5 million for their shares in the company, $5
million would be used for working capital, $18 million would be
used to pay off the company's bank debt and $3.5 million would be
allocated to the sub-debt.

The Siegels accepted Kontogiannis's offer and an agreement
was signed on March 17, 2004 between Kontogiannis, Blue Ridge
Farms, and each of the members of the Siegel family ("March 17
Stock Sale Agreement 1A").  Another agreement was signed the same
day which was substantially the same, though it substituted Chloe
Foods, S.A. (a Greek company), with Kontogiannis acting as agent,
as the party making the investment instead of Kontogiannis
himself ("March 17 Stock Sale Agreement 1B").[19]  Both agreements
provide for: (a) Kontogiannis to repay the bank debt and the $3.5
million sub-debt; (b) transfer of the Atlantic Avenue property to
a third-party entity and subsequent leaseback by Blue Ridge

---

[18] Around the time of Kontogiannis's offer, the investment firm of KKR
also made an offer to invest $30 million in the company in exchange for a 40%
stake.  KKR also offered to guarantee repayment of the sub-debt if they
received a 49% stake in the company.  However, Jeffrey and Richard Siegel felt
more comfortable with Kontogiannis and his offer.

[19] It is unknown which agreement was signed first.  According to
plaintiff, the only substantive difference between the two agreements is that
in Stock Sale Agreement 1B, Chloe Foods, S.A., retained the right to transfer
its shares of Blue Ridge Foods to Chloe Foods, Inc., another entity controlled
by Kontogiannis.
   Since, according to plaintiff, Chloe Foods, S.A. is controlled by
Kontogiannis, this opinion will refer to the investing entity as Kontogiannis
for the sake of simplicity.

Farms;[20] (c) a reorganization of Blue Ridge Farms, with
Kontogiannis being permitted to designate three of the five
Directors and certain company employees; (d) Blue Ridge Farms to
obtain a new working capital loan, with $6.5 million to be
guaranteed by Kontogiannis; and (e) a 51% share of the Illinois
property being transferred to Kontogiannis.[21] Further, Seymour
and June Siegel were to be paid approximately $4 million for
their shares.[22] In both agreements, Kontogiannis represented
that he was acting as an "investor" and that he "had the
opportunity to investigate the business and affairs of the
Company, to ask questions with respect thereto and to have full
access to its books, properties and records."

After the agreements were signed, Kontogiannis began to
exercise control over Blue Ridge Farms, hiring Nick Tisinenkias

---

[20] In one agreement, the property was to be transferred to defendant
Greenvale Financial Center, Inc., an entity allegedly controlled by
Kontogiannis, and in the other, it was to be transferred to an unnamed new
company jointly owned by Kontogiannis and the Siegel brothers.

[21] The transfer of the Illinois property was apparently an additional
term negotiated after the original offer was discussed. The Complaint does
not specify any reasons for the differences between the original offer and the
agreement signed on March 17, nor does it specify the total cost to
Kontogiannis of the signed agreement.

[22] Seymour Siegel died in September, 2005, at which point June Siegel,
as administrator of his estate, became responsible for collecting the amounts
owed by Kontogiannis for his shares. The $4 million amount is referred to in
a copy of Stock Sale Agreement 1A which defendants submitted with their brief
on the motion for summary judgment and which plaintiff agrees is accurate. *See*
Defendants' Exhibit 1.

as the CFO and Ray Shane as in-house counsel.[23]   The Siegels

acquiesced in these actions.


*Kontogiannis' Default and Extension*

     According to plaintiff, soon after signing the March 17

Stock Sale Agreement, Kontogiannis reneged on his obligations.

In particular, Kontogiannis failed to make the $1 million down

payment due on the second business day after execution of the

agreement and instead asked for an additional thirty days,

contending that the bank debt was larger than expected due to

late fees and interest.   The Siegels consented to the extension,

but Kontogiannis never paid the $1 million down payment.


*Sale-Leaseback of Atlantic Avenue Property*

     According to plaintiff, there exist two "Contracts of Sale"

between Blue Ridge Farms (signed by Richard Siegel) and Greenvale

(signed by Annette Apergis, Kontogiannis's daughter) dated April

1, 2004 which call for the sale of the Atlantic Avenue property

to Greenvale for $20 million.[24]   There are also two executed

leases of the same date between Chloe Foods, Inc., d/b/a Blue

---

     [23] The Complaint does specify when exactly these activities took place
but indicates that they occurred shortly after the March 17 agreement was
signed.

     [24] It is not clear from the Complaint whether plaintiff believes these
contracts were actually signed in April or on some date in the future as part
of the May 21 Stock Sale Agreement described below.

Ridge Farms (signed by Richard Siegel), and Greenvale calling for
Chloe Foods, Inc., to lease the property for a monthly rent of
$165,000.  According to plaintiff, this purported sale was a
fraudulent transfer for which no consideration was ever
received.[25]

*May 21 Stock Sale Agreement*

On May 21, 2004, the day before the bank loan was due,
Kontogiannis informed the Siegels that he was backing out of the
March 17 Stock Sale Agreement unless the Siegels agreed to give
him 100% of the Atlantic Avenue and Illinois properties.[26]
Instead of demanding that Kontogiannis fulfill his obligations
under the stock sale agreement, the Siegels agreed to this demand
and, in exchange, June and Seymour Siegel began receiving
payments for the shares they had transferred to Kontogiannis
("May 21 Stock Sale Agreement").  According to plaintiff, no
written document was signed by Blue Ridge Farms memorializing the
revised agreement and no additional consideration was furnished.

---

[25] Plaintiff alleges fraud, though I note that this sale-leaseback
appears consistent with the March 17 Stock Sale Agreement with Kontogiannis
and his investment thereunder.

[26] According to plaintiff, this was the first time Kontogiannis
expressed any reservations about the deal.  Apparently, after the March 17
Stock Sale Agreement, Kontogiannis did not own 100% of these properties,
though the Complaint does not make clear what percentage he owned and who
owned the remaining percentage.

*Transfer of Atlantic Avenue Property*

A deed, dated May 24, 2004 and signed by Jeffrey Siegel on behalf of Blue Ridge Farms reflects a transfer of a portion of the Atlantic Avenue property to a company called "3301 Atlantic Avenue LLC" for $15 million.[27]  The deed contains a certification reflecting a "sales contract date" of April 1, 2004, signed by Jeffrey Siegel for Blue Ridge Farms and Apergis for 3301 Atlantic Avenue LLC.  Another deed, also dated May 24, 2004, was executed by Blue Ridge Farms, transferring the remaining portion of the Atlantic Avenue property to 3301 Atlantic Avenue LLC for $5 million.  These deeds, with the fraudulent representations, were mailed to the Registrar of Deeds on or about May 24, 2004 and were recorded in December 2004.[28]  According to plaintiff, since 3301 Atlantic Avenue LLC did not come into existence until April 23, 2004, there is no record of any contract of sale between Blue Ridge Farms and 3301 Atlantic Avenue LLC, and there is no record that $20 million was ever received by Blue Ridge Farms for this purported sale, these deeds and the certifications were fraudulent.  Around the same time, according to plaintiff, the Illinois property was also transferred to Kontogiannis.  This transfer of property without consideration deprived Blue Ridge

---

[27] It is apparent from the Complaint that plaintiff believes this transfer of property was pursuant to the May 21 Stock Sale Agreement.

[28] The mailing of these deeds is the first RICO predicate act alleged by plaintiff.

Farms of rightful income which its creditors, such as plaintiff, could have looked to for payment for their loans.

*August Stock Sale Agreement*

According to plaintiff, in August 2004, Kontogiannis had another meeting during which he told Jeffrey and Richard Siegel that he was unhappy with his investment in Blue Ridge Farms and that he felt that he had been "screwed." Specifically, Kontogiannis said that Blue Ridge Farms' accounts payables were misrepresented and that he was owed $8 to $10 million. To resolve the dispute, Jeffrey and Richard Siegel personally paid Kontogiannis an additional $4.8 million.

According to plaintiff, at around the same time, Jeffrey and Richard Siegel entered into a new stock sale agreement with Kontogiannis and Chloe Foods, Inc. ("August Stock Sale Agreement"). Under that agreement (which was dated March 18, 2004 but according to plaintiff was not signed until August 2004),[29] Jeffrey and Richard Siegel agreed to sell their remaining shares of Blue Ridge Farms stock to "Chloe Foods, Inc." In exchange, Chloe Foods, Inc., assumed all debts and obligations of Blue Ridge Farms. Sometime after, a rider to this agreement was signed, giving Jeffrey and Richard Siegel each 20% of the

---

[29] According to plaintiff, Chloe Foods Corp. was not registered to do business in New York before March 25, 2005.

reorganized company that was once Blue Ridge Farms but was now "Chloe Foods Corp.," with the option to purchase an additional 5% each for up to 10 years; the remainder of the company was owned by Chloe Foods, S.A. Jeffrey and Richard Siegel were also given the right to appoint two directors to the Chloe Foods Corp. Board of Directors and were entitled to 50% of the profits of the company.

*Fraudulent Loan Documents*

According to plaintiff, several weeks after Jeffrey and Richard Siegel agreed to sell their remaining shares of Blue Ridge Farms stock to Chloe Foods, Inc., Kontogiannis approached them to tell them that he did not think they were going to pay back the $4.8 million in any reasonable time. Around this time Kontogiannis had also stopped making payments to Seymour and June Siegel for their shares of the company.[30] According to plaintiff, Kontogiannis proposed that Jeffrey and Richard Siegel take a combined 10% of the reorganized company instead of the 50% they were entitled to under the August Stock Sale Agreement. Plaintiff alleges that Jeffrey and Richard, interested in making sure their parents were paid and in realizing the potential of the olive oil business, agreed to fraudulently rework the March

_____

[30] This led to an argument between Kontogiannis and Seymour Siegel that apparently precipitated Kontogiannis' meeting with Jeffrey and Richard Siegel.

17, 2004 investment into a secured loan from 3301 Atlantic Avenue LLC.

According to plaintiff, to facilitate this "scheme" a number of fraudulently back-dated documents were prepared at Kontogiannis's direction and signed by Jeffrey and Richard Siegel. In particular, a document called "8% Secured Note Due March 19, 2009" ("Secured Note") in the amount of $11.5 million from 3301 Atlantic Avenue LLC was drawn up and dated March 19, 2004, and was signed by Jeffrey Siegel on behalf of Blue Ridge Farms; plaintiff alleges that Jeffrey Siegel did not in fact sign the document on March 19, 2004 but rather did so much later, at some point after August 2004.[31][32] As evidence of the fraudulent nature of this document, plaintiff notes that 3301 Atlantic Avenue LLC did not come into existence as a legal entity until April 23, 2004 and on the date the note was executed (and up to the time of this action), Kontogiannis had not given the company the $11.5 million referred to in the Secured Note; a schedule of payments attached to the Secured Note indicated payments between April 9, 2004 and December 31, 2005 totaling just over $3

---

[31] A more exact date is not referred to in the Complaint.

[32] The Secured Note called for a purchase money security interest in the equipment delivered to Blue Ridge Farms under the note. Plaintiff does not indicate what equipment was delivered under the note.

million.[33]

Another allegedly fraudulent document, referred to as a "Security Agreement" and dated May 21, 2004, was signed by Richard Siegel on behalf of Blue Ridge Farms; plaintiff alleges that Richard Siegel did not in fact sign the document on May 21, 2004, but rather did so much later, at some point after August 2004.[34] That Security Agreement references a promissory note also dated May 21, 2004 for $8 million owed to 3301 Atlantic Avenue LLC. According to plaintiff, there is no record that an $8 million loan was ever made.

Plaintiff alleges that these back-dated documents were created in a fraudulent attempt by Kontogiannis and Jeffrey and Richard Siegel to conceal the nature of the previous stock sale agreements and to "unlawfully convert the equity investment . . . into a secured transaction." According to plaintiff, Kontogiannis wanted to change the deal since he determined it would be better to be a creditor than an investor, but neither he nor any related entity ever loaned either the $11.5 million or the $8 million referred to in these documents to Blue Ridge Farms. In furtherance of this scheme, a UCC-1 financing

---

[33] The note was acknowledged by Apergis on behalf of 3301 Atlantic Avenue LLC on January 6, 2005. It is not clear what the significance of the "acknowledged" date is, though plaintiff alleges that it is part of defendants' fraud.
    It is not known whether that schedule of payments was attached to the original Secured Note or only attached at some date in the future.

[34] A more exact date is not referred to in the Complaint.

statement[35] was filed by mail with the "Register"[36] in November
2004 and subsequent financing statements were filed in January
2005, March 2005 and June 2005.

*Kontogiannis' Foreclosure on Blue Ridge Farms*

In November 2004, Kontogiannis wrote to Jeffrey and Richard
Siegel regarding resolution of his investment in Blue Ridge Farms
and represented that he had, to that point, invested only $24
million in Blue Ridge Farms.[37] He offered the Siegels three
options. Option 1 called for the Siegel brothers to find a buyer
for the company and repay Kontogiannis $11 million of his
investment, as well as commit to a long term lease of the
Atlantic Avenue property; Option 2 called for the Siegel brothers
to personally assume $8 million in debt owed by Blue Ridge Farms
to various creditors and to accept a one time payment of $2.3
million and reduce their compensation accordingly. Option 3

---

[35] The filing of a UCC-1 financing statement is a means of perfecting a
creditor's interest in collateral and giving that creditor priority over other
creditors.

[36] The Complaint does not state who the "Register" is but it presumably
means the Secretary of State, to whom such financing statements are normally
directed. It is also reasonably inferred that these UCC-1 statements
contained misrepresentations about the fraudulent loan, which served as the
basis for the security interest.

[37] Plaintiff notes that this is surprising given the fact that
Kontogiannis had allegedly purchased the Atlantic Avenue property for $20
million and, according to the documents described above, had made close to $20
million in secured loans. As plaintiff describes the letter, Kontogiannis
wrote that "without regard to the real estate transactions, which will stand
on their own merits, I have invested $8.5 million and guaranteed $1.5 million
in overdrafts at the point." Plaintiff alleges that this proves that $20
million was not paid for the Atlantic Avenue property.

called for Kontogiannis to "foreclose on the UCC I hold against
the company, wiping out all existing debt notwithstanding the
ramifications this may cause your family."  There is no
indication in the Complaint whether the Siegels responded to this
letter.

On December 30, 2004, 3301 Atlantic Avenue LLC issued a
"Notice of Default" to Blue Ridge Farms, stating the Blue Ridge
Farms was in default of the May 21, 2004 Security Agreement due
to (1) Blue Ridge Farms' misrepresentation of the state of the
company under the Stock Sale Agreement of March 17, 2004 and (2)
Blue Ridge Farms' failure to make installment payments on the
note secured by the Security Agreement.[38]  According to
plaintiff, this Notice of Default was fraudulent, since (1) the
Security Agreement was prepared after the Stock Sale Agreement
and after Kontogiannis knew of the alleged misrepresentations, so
the misrepresentations could not form the basis for default; (2)
the Security Agreement itself was fraudulent, as discussed above;
and (3) Kontogiannis was controlling the affairs of Blue Ridge
Farms at the time of alleged failure to pay and therefore
controlled what payments were made.

According to plaintiff, on January 3, 2005, Jeffrey Siegel
was presented with a document for his signature, prepared by

---

[38] According to plaintiff, Jeffrey Siegel laughed when he received this
notice.

someone working with Kontogiannis and made to look like it was
written from Blue Ridge Farms, which acknowledged the default on
behalf of Blue Ridge Farms, waived its rights to redeem the
collateral under the Security Agreement,[39] and surrendered its
rights to that collateral to 3301 Atlantic Avenue LLC.  After a
conversation with Kontogiannis, Jeffrey Siegel signed the
document.  According to plaintiff, Kontogiannis told Jeffery
Siegel that he felt he had been misled and that he was operating
in good faith and trying to set things right and that it would be
in everyone's best interests, especially the Siegel parents and
the sub-debt holders, to move forward.  Plaintiff alleges that
Jeffrey Siegel's decision to sign the document came only after
"very active discussions with respect to ensuring that his
parents would be paid for their shares" and that he received
nothing in writing regarding Kontogiannis' assurances.[40]

In a January 7, 2005 letter, BRF Acquisition presented a
letter to Jeffrey Siegel stating that it was the assignee of 3301
Atlantic Avenue LLC and that it intended to retain the collateral
under the Security Agreement in partial satisfaction of the debt

---

[39] What the collateral consisted of is not stated in the Complaint,
though it appears from the Complaint that the collateral consisted of
substantially all the remaining assets of Blue Ridge Farms.

[40] The reasonable inference from this statement, in light of the whole
Complaint, is that Jeffrey Siegel ensured that his parents would be paid at
the expense of sub-debt holders and other creditors.

owed by Blue Ridge Farms; the letter was signed by Apergis.[41]

That same day, Jeffrey Siegel was presented another document for

his signature, again prepared by someone working with

Kontogiannis and again made to look like it was written from Blue

Ridge Farms, in which he again acknowledged Blue Ridge Farms'

default under the Security Agreement and consented to 3301

Atlantic Avenue LLC retaining the collateral.  According to

plaintiff, Jeffrey Siegel realized that he was giving up all Blue

Ridge Farms owned to Kontogiannis but he did not care since he

was still to be employed as President by Chloe Foods, Inc. at a

"substantial salary" and he was promised that his parents would

receive payment for their shares.[42]  After this foreclosure, Blue

Ridge Farms apparently had no more assets from which creditors

could collect.

According to the Complaint, on June 22, 2005 and again on

June 22, 2006, Kontogiannis and/or Apergis filed assignments, by

mail, with the United States Patent and Trademark Office of all

of Blue Ridge Farms' trademarks and other intellectual property

---

[41] According to plaintiff, BRF Acquisition did not come into existence
as a legal entity until January 10, 2007.

[42] According to the Complaint, Jeffery Siegel is currently employed by
Kontogiannis at a salary of $400,000 year.  June Siegel also entered a
settlement with Kontogiannis at an unknown date under which she is to receive
an "additional" $2.5 million for her shares and Seymour Siegel's estate is to
receive an "additional" $1 million, although is not clear from the Complaint
if this "additional" payment constitutes satisfaction of what Kontogiannis
previously agreed to pay in the March 17 Stock Sale Agreement for the shares
or whether it is in addition to the amounts agreed to in that document.

to one of the defendant corporations.[43]   The filing of the June
22, 2006 assignment is the most recent RICO predicate act alleged
by plaintiff.


*Chloe Foods Corp.*

According to plaintiff, sometime after January 2005, Apergis
was named CEO of Chloe Foods Corp. by Kontogiannis to coordinate
the merger of Chloe Foods and Blue Ridge Farms.  According to the
Complaint, Chloe Foods Corp. operates as a "mere continuation" of
Blue Ridge Farms, "with substantially the same management,
personnel, assets and at the same physical location [3301
Atlantic Avenue]."  Chloe Foods Corp. also continues to use the
Blue Ridge Farms name and logo on the products it sells.   In
addition, according to plaintiff, Chloe Foods Corp. and
Kontogiannis "directed and continue to direct the payment of Blue
Ridge Farms debts on a case by case basis, including the
repayment of trade debt and sub-debt," as well as retaining
lawyers for pending litigation against Blue Ridge Farms and its
officers.


*Fraud Against Non-Party Creditors*

According to the Complaint, the fraud was not only targeted

---

[43] The specific entity to which the assignment was made is not described
in the Complaint.  It is to be reasonably inferred from the Complaint that no
such assignment was ever legally authorized by Blue Ridge Farms.

at plaintiff.  Kontogiannis, Apergis and the Siegel brothers have used the fraudulent documents discussed above to defraud other legitimate creditors of Blue Ridge Farms.

One such situation involved Crown Credit Corporation, a creditor of Blue Ridge Farms which was involved in a breach of contract action with Blue Ridge Farms in this district, filed in 2001.[44]  In February 2005, after a non-jury trial in that action but before the judge issued his decision, Apergis, on behalf of BRF Acquisition, mailed and faxed a notice to Crown Credit, notifying it that because of Blue Ridge Farms' default under the Security Agreement and Secured Note, BRF Acquisition proposed to retain the assets of Blue Ridge Farm in "partial satisfaction of its obligations," which would shelter the assets should the court rule in favor of Crown Credit.  According to plaintiff, Apergis subsequently filed a false affidavit with the district court stating that the foreclosure had nothing to do with the lawsuit but was simply a result of Blue Ridge Farms' default on its obligations.

In another situation, on May 3, 2005, Shane sent a letter from Chloe Foods Corp. to L.M. Foods, LLC, a company to which Blue Ridge Foods owed more than $140,000.  That letter stated that Chloe Foods Corp. managed the assets of BRF Acquisition which had foreclosed on Blue Ridge Farms and offered to settle

---

[44] *See Blue Ridge Farms, Inc v. Crown Credit Company et al*, 01-CV-8460.

Blue Ridge Farms' debt for around $42,000 in order to maintain a business relationship with L.M. Foods. In July of 2005, another letter was sent to L.M. Foods, threatening to seek damages for malicious prosecution should L.M. Foods commence an action against BRF Acquisition. When L.M. Foods subsequently sued BRF Acquisition and Chloe Foods Corp. to recover its debt, these entities attached the allegedly fraudulent security documents discussed above to their pleadings.[45]

Another action to recover a debt was filed in this district around the same time by Harold Goldberg, another creditor of Blue Ridge Farms.[46] In that action, the same attorney who represented Blue Ridge Farms in the L.M. Foods action and had stated that Blue Ridge Farms was longer in business stated that she represented Blue Ridge Farms, Inc., in order, according to plaintiff, to mislead the court and Goldberg into believing that Blue Ridge Farms was still in operation.[47]

## Discussion

---

[45] Plaintiff has not alleged that this submission amounts to obstruction of justice, 18 U.S.C. § 1503.

[46] See Goldberg v. Blue Ridge Farms, et al, 04-CV-5098.

[47] Plaintiff has not alleged that this submission amounts to obstruction of justice, 18 U.S.C. § 1503.
Plaintiff alleges that "numerous other legitimate creditors of Blue Ridge Farms" were and continue to be defrauded in similar ways through the use of the fraudulent security agreements and foreclosure documents and that the fraud involves mail and wire fraud as well as obstruction of justice, though plaintiff does not have specific evidence at this stage of the litigation.

I. Subject Matter Jurisdiction

At oral argument, I asked the parties to brief the question as to the source of this Court's jurisdiction over pendant defendants against whom there is no claim conferring independent federal jurisdiction, as is the case here, where plaintiff has asserted only state law claims against all the non-RICO defendants and concedes that diversity jurisdiction does not exist. Subsequent to that request, and after the parties had filed letter briefs on the subject, the non-RICO defendants filed a formal motion to dismiss for lack of subject matter jurisdiction on these same grounds on July 16, 2007.

Pursuant to 28 U.S.C. § 1367(a),[48] when a federal district court has original jurisdiction over some defendants in an action due to the nature of the claims against those defendants, it also has supplemental jurisdiction over pendant parties and claims, so long as the cause of action against those other defendants arises from the same case or controversy. *See Herrick Co., Inc. v. SCS Communications, Inc*., 251 F.3d 315, 326 (2d Cir. 2001) ("[A]s a general matter, § 1367 expands supplemental jurisdiction to all claims and all parties that are part of the same constitutional case over which there exists independent federal jurisdiction.");

_____

[48] The statute reads, in relevant part, "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

*Goodwin v. Seven-Up Bottling Co. of Phila.,* 1996 WL 601683, at *4
(E.D.Pa. 1996) (citing *Dici v. Com. of Pa.,* 91 F.3d 542, 553 (3d
Cir. 1996)) ("The district court's power to exercise supplemental
jurisdiction [under Section 1367] is broad enough to support
jurisdiction over a state claim against a person not a party to
the primary jurisdiction-granting claim if there is a common
nucleus of operative fact with respect to the state claim against
that person and the federal claim."); *Broach v. Miller,* 1993 WL
313138, at *2 (N.D.Cal. 1993).  In the present case, subject
matter jurisdiction over the RICO claim is conferred pursuant to
federal question jurisdiction, 28 U.S.C. § 1331, and the claims
against the non-RICO defendants do arise from the same set of
operative facts, namely the overall scheme to defraud plaintiff
and other creditors by siphoning off the assets of Blue Ridge
Farms and allocating those assets among the companies controlled
by Kontogiannis.  Accordingly, this Court may exercise
supplemental jurisdiction over the pendant parties and pendant
claims pursuant to § 1367(a).

That said, § 1367(c) "confer[s] on federal courts at least
some discretion to not hear claims over which there is
supplemental jurisdiction in the enumerated circumstances."
*Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d
442, 447 (2d Cir. 1998).  "Once a court identifies one of the
factual predicates which corresponds to one of the subsection

1367(c) categories, the exercise of discretion is informed by whether remanding the pendent state claims comports with the underlying objective of most sensibly accommodating the values of economy, convenience, fairness, and comity." *Id.* at 446 (internal citations and quotations omitted); *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004).

Section 1367(c) allows a federal court discretion to decline to exercise supplemental jurisdiction where:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

None of the claims in this case appear to raise complex or novel issues of state law, nor has this Court (as discussed below) dismissed all claims over which it has original jurisdiction. Further, there do not appear to be "exceptional circumstances" which make this case "quite unusual." *Itar-Tass Russian News Agency,* 140 F.3d 442 at 448 ("Congress has sounded a note of caution that the bases for declining jurisdiction should be extended beyond the circumstances identified in subsections (c)(1)-(3) only if the circumstances are quite unusual. In other words, declining jurisdiction outside the ambit of 1367(c)(1)-(3) appears as the exception rather than the rule. Thus, federal

courts must ensure that the reasons identified as 'compelling'
are not deployed in circumstances that threaten this principle.")
(internal citations and quotations omitted). "The type of
activity that gives rise to RICO claims also frequently gives
rise to lesser state law claims, such as fraud or unjust
enrichment." *U.S. Fire Ins. Co. v. United Limousine Service,
Inc.,* 328 F.Supp.2d 450, 454 (S.D.N.Y. 2004). Thus, the only
question is whether state law claims predominate over the federal
claims.

> When a district court exercises its discretion not to
> hear state claims under § 1367(c)(2), the advantages of
> a single suit are lost. For that reason, §
> 1367(c)(2)'s authority should be invoked only where
> there is an important countervailing interest to be
> served by relegating state claims to the state court .
> . . . . This will normally be the case only where a state
> claim constitutes the real body of a case, to which the
> federal claim is only an appendage, only where
> permitting litigation of all claims in the district
> court can accurately be described as allowing a federal
> tail to wag what is in substance a state dog.

*Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 789 (3d Cir.
1995) (internal quotations and citations omitted); *see also
State of New York v. Phillip Morris Inc.,* 1998 WL 2574, at *2
(S.D.N.Y. 1998) (quoting *Lancaster*). "In general, the question
of whether state law predominates . . . must be answered by
looking to the nature of the claims as set forth in the pleading
and by determining whether the state law claims are more complex
or require more judicial resources to adjudicate or are more
salient in the case as a whole than the federal law claims."

*Diven v. Amalgamated Transit Union Int't & Local 689*, 38 F.3d
598, 601 (D.C.Cir. 1994); *see also Occunomix International LLC v.
North Ocean Ventures, Inc.*, 2003 WL 22240660, at *1 (S.D.N.Y.
2003) (quoting *Diven*); *SST Global Technology, LLC v. Chapman*, 270
F.Supp.2d 444, 456 (S.D.N.Y. 2003)("Courts in this circuit have
found that state claims predominate over federal claims where the
federal claims involve a technical or other issue that is
peripheral to the state claims."); *Dunlop v. City of New York,*
2006 WL 2853972, at *6  (S.D.N.Y. 2006) ("[I]t is not the ratio
of state to federal claims that is determinative, but the
substance.").

    In this case, as discussed in more detail below, the federal
law RICO claim "arise[s] out of a series of events that are
interrelated" with the events which underlie the state law claims
and requires "virtually the same proof as the state law claims,"
specifically proof that defendants were engaged in fraudulent
transfers of Blue Ridge Farms' assets which serve as the basis
for all plaintiff's claims. *Dunlop,* 2006 WL 2853972, at *6; *see
also Pro Bono Investments, Inc. v. Gerry,* 2005 WL 2429787, at *14
(S.D.N.Y. 2005) ("With respect to the other ten state law
counterclaims, the relationship between these counterclaims and
[plaintiff's] unjust enrichment claim is sufficiently close that
the Court cannot decline supplemental jurisdiction over them.");
*cf. Gliatta v. Stein,* 2004 WL 1171714, at *2 (W.D.N.Y. 2004)

("[T]he elements of proof necessary to prove the state law claims
of strict products liability, lack of informed consent and
negligence, including in all likelihood expert testimony
regarding a manufacture or design defect in the artificial hip,
goes well beyond the elements of proof necessary to prove a claim
of deliberate indifference in a prison context and, therefore,
the exercise of supplemental jurisdiction over the state law
claims would result in a substantial expansion of the action
beyond that necessary and relevant to the federal claim.")
(internal citations and quotations omitted).  Exercising
supplemental jurisdiction over the state law claims in this case
would not result in any substantial expansion, and possibly no
expansion at all, beyond what is necessary to adjudicate the
federal RICO claim, while declining jurisdiction would result in
a significant duplication of efforts in state court that should
be avoided in the name of judicial economy.  Accordingly I will
not decline to exercise jurisdiction over the state law claims in
this case.

II. Defendants' Motion to Dismiss RICO Count

        According to defendants, plaintiff's allegation of a RICO
violation fails to state a claim for relief and must be
dismissed.  Defendants further argue that since the remaining
claims are not themselves subject to federal jurisdiction, they

should be dismissed as well. *See* 18 U.S.C § 1367(c)(3).[49]


*Standards for Motion to Dismiss*

In considering a motion pursuant to Rule 12(b)(6), a court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002)(citing *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Helt Funding Corp.,* 27 F.3d 763, 771 (2d Cir. 1994). On a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. V. Town of Darien*, 56 F.3d 375,378 (2d Cir. 1995). Dismissal is appropriate only when it "appears beyond a doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80,83 (2d Cir. 2000); *see also McLaughlin v. Anderson*, 962 F.2d 187, 190 (2d Cir. 1992) ("A district court should grant a motion to dismiss a RICO claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the

---

[49] Plaintiff does not disagree that, should the motion to dismiss the RICO claim be granted, the remaining claims should also be dismissed.

allegations . . . . In applying this standard, the Court must read the facts alleged in the complaint in the light most favorable to [plaintiff].") (internal citations and quotation marks omitted).  Additionally, a complaint should be dismissed under Rule 12(b)(6) if a court finds that the plaintiff's claims are barred as a matter of law. *Conopco, Inc. v. Roll Intern.*, 231 F.3d 82, 86 (2d Cir. 2000).

In reviewing motions to dismiss RICO claims, courts of this circuit have noted that RICO violations "must be reviewed with appreciation of the extreme sanctions [the statute] provides, so that actions traditionally brought in state courts do not gain access to treble damages and attorneys fees in federal court simply because they are cast in terms of RICO violations." *Mathon v. Marine Midland Bank, N.A.*, 875 F.Supp. 986, 1001 (E.D.N.Y. 1995); *see also Schmidt v. Fleet Bank*, 16 F.Supp.2d 340, 346 (S.D.N.Y. 1998) ("[Civil RICO] is an unusually potent weapon – the litigation equivalent of a thermonuclear device . . . [and] courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.").

*Plaintiff's Rico Claims*

Plaintiff alleges that the RICO Defendants, Kontogiannis, Apergis and the Siegel brothers, are liable to plaintiff under 18

U.S.C. § 1962(c), which makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[50]  Specifically, plaintiff alleges that the RICO Defendants manipulated a group of legal entities[51] so as to fraudulently transfer the assets of Blue Ridge Farms to entities controlled by Kontogiannis in a manner which rendered plaintiff's debt uncollectible, as well as the debt of other creditors, and which also caused her to incur attorney's fees in her attempt to collect on the debt and in the present action.

There are seven elements to a RICO claim brought under § 1962(c): "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly conducts or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983).  Additionally, in order to pursue a civil claim for a RICO violation, the plaintiff must

---

[50] While RICO is a criminal law, 18 U.S.C. § 1964(c) gives persons injured by conduct proscribed in 18 U.S.C. § 1962 the right to bring a civil suit for treble damages and costs including attorney's fees.

[51] These entities include Chloe Foods, Inc., Chloe Foods, S.A., BRF Acquisitions, Greenvale, Anperg, Inc., Blue Ridge Farms (Illinois), and Blue Ridge Farms, Inc.

allege that she has been proximately injured by the predicate RICO acts or the pattern of RICO activity. *Id.; see* 18 U.S.C. § 1964© ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court.").

The terms enterprise, racketeering activity, and pattern as used above are terms of art. An "enterprise" is a legal entity or an association-in-fact. *See* 18 U.S.C. § 1961(4). "Racketeering activity" includes any act indictable under a variety of state and federal criminal statutes specifically listed in 18 U.S.C. § 1961(1), including, as relevant to this action, the mail fraud statute, 18 U.S.C. § 1341,[52] the wire fraud statute, 18 U.S.C. § 1343,[53] and the obstruction of justice statute, 18 U.S.C. §

---

[52] The statute reads, in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or knowingly causes to be delivered by mail or such carrier according to the direction thereon . . . any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

[53] The statute reads, in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . or the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

1503.[54]  A "pattern" of racketeering activity involves at least
two predicate acts meeting the definition of racketeering
activity. *See* 18 U.S.C. § 1961(5).[55]

*Plaintiff's Injury*

As noted, to state a RICO claim, the plaintiff must allege
that the pattern of RICO activity or the violations which serve
as the predicate RICO acts "proximately cause[d] plaintiff's
injury." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23
(2d Cir. 1990).[56]  "The RICO pattern or acts proximately cause a
plaintiff's injury if they are a substantial factor in the
sequence of responsible causation, and if the injury is
reasonably foreseeable or anticipated as a natural consequence."
*Id.* at 23-24; *see also Red Ball Interior Demolition Corp. v.*

---

18 U.S.C. § 1343.

[54] The statute reads, in relevant part: "Whoever corruptly . . .
endeavors to influence, intimidate, or impede any . . . officer in or of any
court of the United States . . . in the discharge of his duty . . . or
corruptly . . . influences, obstructs, or impedes, or endeavors to influence,
obstruct, or impede, the due administration of justice" is guilty of a crime.
18 U.S.C. § 1503(a).

[55] "[T]he bare minimum of a RICO charge is that a defendant personally
committed or aided and abetted the commission of two predicate acts."
*McLaughlin v. Anderson,* 962 F.2d 187, 192 (2d Cir. 1992).  On this motion to
dismiss, defendants have not argued that plaintiff has failed to allege that
each defendant personally committed or aided in the commission of two
predicate acts.

[56] Common law fraud and fraudulent conveyance are not predicate acts
under § 1961(1) and, accordingly, plaintiff's allegations of such fraud are
not considered in determining whether she suffered injury from a RICO
predicate act.

*Palmadessa*, 874 F.Supp. 576, 584 (S.D.N.Y. 1995) ("An act which proximately caused an injury is analytically distinct from one which furthered, facilitated, permitted or concealed an injury which happened or could have happened independently of the act."); *Leung v. Law,* 387 F.Supp.2d 105, 122 (E.D.N.Y. 2005) ("[A] predicate act cannot be deemed to have proximately caused a plaintiff's injury, even if it was an integral part of the underlying criminal scheme, unless the plaintiff's original loss could not have occurred without the commission of the predicate act.").

In the present action, although plaintiff alleges several violations of § 1961(1) (including mail fraud and obstruction of justice) allegedly targeted at non-party creditors (such as mailing the allegedly fraudulent "Security Agreement" to Crown Credit and L.M. Foods), the only predicate acts relevant to determining whether plaintiff has been injured are those which allegedly caused injury to plaintiff herself. *See Tarr v. Credit Suisse Asset Management, Inc.,* 958 F.Supp. 785, 802 (E.D.N.Y. 1997) (Plaintiff "must establish that the alleged acts constituted a pattern of racketeering activity that was intended to defraud him personally.").[57]  Reading the Complaint in its

---

[57] Though not discussed by the parties, I note that in this district, Judge Glasser has noted with approval the Seventh and Third Circuit opinions which have held that to state a claim, plaintiff must only allege injury from *one* of the predicate acts. *See Giuliano v. Everything Yogurt, Inc.*, 819 F.Supp. 240, 243 (E.D.N.Y.,1993); *see also Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809 & n. 6 (7th Cir. 1987); *Town of Kearny v. Hudson*

most favorable light, plaintiff alleges several different

predicate acts which caused her injury, namely her inability to

collect her debt,[58] and taking every inference in favor of

plaintiff, she was indeed directly injured by at least one of

these activities, namely the filing of the allegedly fraudulent

UCC-1 financing statement.  When defendants filed the UCC-1

financing statement in November of 2004, it perfected the

security interest of 3301 Atlantic Avenue LLC in the collateral

(which, from the Complaint, appears to have included all of Blue

Ridge Farms' remaining assets) and gave 3301 Atlantic Avenue LLC

priority over all creditors.  Had this security interest remained

unperfected, plaintiff, once she was awarded judgment, would have

been able to obtain a judicial lien (through attachment) against

the assets of Blue Ridge Farms and would have had priority even

against 3301 Atlantic Avenue LLC's secured but unperfected

interest.  Instead, since the security interest was perfected by

the filing of the UCC-1, plaintiff's judgment was rendered

_Meadows Urban Renewal Corp._, 829 F.2d 1263, 1268 (3d Cir. 1987).

[58] The five predicate acts which allegedly injured the plaintiff were:
(1) obstruction of justice, in violation of 18 U.S.C. § 1503, when defendants
submitted a copy of the fraudulent New Note to the district court; (2) wire
fraud, in violation of 18 U.S.C. § 1343, when defendants faxed a copy of the
New Note to plaintiff during the course of her litigation; (3) mail fraud, in
violation of 18 U.S.C. § 1341, when defendants sent a copy of the allegedly
fraudulent deed for the Atlantic Avenue property to the Register; (4) mail
fraud, when defendants sent in the assignments of Blue Ridge Farms'
intellectual property to the Patent and Trademark Office; and (5) mail fraud,
when defendants submitted their UCC-1 financing statement to the Register,
which was based on the fraudulent Security Agreement.  Since I find injury
demonstrated by the filing of the UCC-1 financing statement, I need not
determine whether plaintiff has sufficiently alleged injury through the other
predicate acts.

-37-

uncollectible.[59] *See* White & Summers, *Uniform Commercial Code* §

33-2 (UCC "Section 9-317 subordinates an unperfected secured

creditor to a lien creditor and, by negative implication, says

that a perfected secured creditor beats a lien creditor. . . .

Thus, if a bank takes a security interest in the debtor's

equipment but fails to file a financing statement or to take

possession, and an unsecured creditor levies against the property

and so procures a judicial lien on it, this formerly unsecured

creditor (now a "lien creditor") will defeat the prior

unperfected secured creditor.").[60]


*Association-in-Fact*

Defendants also argue that the Complaint fails to

demonstrate the existence of a RICO enterprise.  Under 18 U.S.C.

§ 1961(4), a RICO 'enterprise' is defined as "any . . . group of

---

[59] To the extent defendants argue that plaintiff cannot demonstrate an injury here since she herself was not the party relying on the alleged fraud, the Second Circuit has taken the opposite view, noting that a plaintiff may establish injury by demonstrating that the injury was the result of another parties' reliance. *Ideal Steel Supply Corp. v. Anza,* 373 F.3d 251, 262-263 (2d Cir. 2004) (overturned on other grounds) ("Rather, the principle governing the present case is that where a complaint contains allegations of facts to show that the defendant engaged in a pattern of fraudulent conduct that is within the RICO definition of racketeering activity and that was intended to and did give the defendant a competitive advantage over the plaintiff, the complaint adequately pleads proximate cause, and the plaintiff has standing to pursue a civil RICO claim. This is so even where the scheme depended on fraudulent communications directed to and relied on by a third party rather than the plaintiff.").

[60] To the extent plaintiff also alleges that she was injured by having to expend attorney's fees in the action to enforce the judgment and in this action, I need not make any determination at this stage of the litigation whether such fees are cognizable as proximate RICO injuries.

individuals associated in fact although not a legal entity."
Such an association-in-fact "is an entity . . . associated
together for a common purpose of engaging in a course of conduct
. . . . [and] is proved by evidence of an ongoing organization,
formal or informal, and by evidence that the various associates
function as a continuing unit." *U.S. v. Turkette*, 452 U.S. 576,
583 (1981). "[A]n association-in-fact is oftentimes more readily
proven by what it does, rather than by abstract analysis of its
structure," *U.S. v. Coonan*, 938 F.2d 1553, 1559 (2d Cir. 1991)
(emphasis in original), and "[c]ourts in the Second Circuit must
look to the 'hierarchy, organization, and activities' of an
association-in-fact to determine whether 'its members functioned
as a unit.' *First Nationwide Bank v. Gelt Funding Corp.*, 820
F.Supp. 89, 98 (S.D.N.Y. 1993) (quoting Coonan, 938 F.2d at
1560-61).  The facts described above demonstrate that, for the
purposes of a motion to dismiss, there was an association-in-
fact, with Kontogiannis, Apergis, and the Siegel brothers working
together to loot Blue Ridge Farms of its assets.  Plaintiff has
alleged several fraudulent transactions, such as the transfer of
the Atlantic Avenue property and fraudulent security agreements,
in which these parties participated, with Kontogiannis as the
ringleader and Apergis and the Siegel brothers as his assistants
and facilitators, and the reasonable inference is that these
defendants shared a common purpose of accruing the value of the

company to themselves at the expense of creditors.[61]  The result

of this fraud was that Kontogiannis controlled the assets of the

former Blue Ridge Farms, the Siegel parents were paid for their

shares, and at least Jeffrey Siegel ended up with a high paying

job working for Kontogiannis, while the creditors of Blue Ridge

Farms were left with offers of pennies on the dollar for their

uncollectible debt.


*Pattern of Racketeering Activity*

Defendants further argue that plaintiff has not sufficiently

alleged a 'pattern of racketeering activity.'  To state a claim,

"a plaintiff in a RICO action must allege either an open-ended

pattern of racketeering activity (i.e., past criminal conduct

coupled with a threat of future criminal conduct) or a

closed-ended pattern of racketeering activity (i.e., past

criminal conduct extending over a substantial period of time)."

*GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 466

(2d Cir. 1995).[62]  These forms of continuity demonstrate that the

---

[61] These creditors include not just the sub-debt holders but also other
creditors of the company, like Crown Credit and L.M. Foods.
    The fact that Kontogiannis and the Siegel brothers were counter-parties
in this transaction does not, by itself, demonstrate that there was no
association-in-fact, since they worked together to achieve a common goal of
maximizing the value in the company by eliminating creditors' ability to
recover debts.  While it appears that the Siegel brothers may have been forced
to renegotiate the amount of their take, that only demonstrates that the
parties to the fraud had internal disputes, not that the fraud did not exist.

[62] As the Second Circuit has noted, without deciding, the Seventh and
Third Circuits' view that "a pattern of racketeering activity may be based
upon predicate acts directed against nonplaintiffs as long as one act injures

RICO acts "were neither isolated nor sporadic." *Id*. at
467(internal quotations omitted).

"To satisfy open-ended continuity, the plaintiff need not
show that the predicates extended over a substantial period of
time but must show that there was a threat of continuing criminal
activity beyond the period during which the predicate acts were
performed." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,
Inc.*, 187 F.3d 229, 242 (2d Cir. 1999). "[W]here the enterprise
primarily conducts a legitimate business, there must be some
evidence from which it may be inferred that the predicate acts
were the regular way of operating that business, or that the
nature of the predicate acts themselves implies a threat of
continued criminal activity." *Id*. at 243. Although all the
assets of Blue Ridge Farms have apparently been transferred to
entities controlled by Kontogiannis, the RICO defendants have
allegedly engaged in multiple acts of obstruction of justice
(such as submitting false documents in plaintiff's original
action against Blue Ridge Farms and in the Crown Credit action)
and have sent letters to creditors (such as Crown Credit and L.M.
Foods) informing them that their debts are uncollectible, at one

the plaintiff so as to create standing for that plaintiff . . . . appears to
be a correct reading of § 1964(c) which accords standing to '[a]ny person
injured in his business or property by reason of a violation of section
1962.'*Terminate Control Corp. v. Horowitz* 28 F.3d 1335, 1347 (2d Cir. 1994)
(citing *Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263, 1268 (3d
Cir. 1987); *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809-10 (7th
Cir. 1987)). Accordingly, the pattern of racketeering activity includes all
alleged RICO acts, not just those directed at plaintiff.

point even threatening litigation should the creditor seek a
judicial remedy.  According to the Complaint, these actions were
taken to prevent legitimate creditors of Blue Ridge Farms from
collecting on their debts, and there are many other creditors of
Blue Ridge Farms whose debts have been rendered uncollectible by
the fraud as well.  It is to be fairly inferred that when these
other creditors attempt to collect their debts, the defendants
will engage in a continued course of fraudulent conduct,
including the mailing of fraudulent documents and the submission
of fraudulent affidavits, to prevent these other creditors from
collecting valid debts.  Accordingly, plaintiff has sufficiently
alleged open-ended continuity.

In addition, the Complaint sufficiently alleges closed-ended
continuity.  "To satisfy closed-ended continuity, the plaintiff
must prove 'a series of related predicates extending over a
substantial period of time.  Predicate acts extending over a few
weeks or months . . . do not satisfy this requirement."
*Cofacredit*, 187 F.3d at 242 (quoting *H.J., Inc. v. Northwestern
Bell Tel. Co.*, 492 U.S. 229, 242 (1989)).  "While closed ended
continuity is primarily concerned with the time period of the
activities, the court also considers factors such as the 'number
and variety of predicate acts, the number of both participants
and victims, and the presence of separate schemes' as relevant
when determining whether closed ended continuity exists." *SKS*

-42-

*Constructors, Inc. v. Drinkwine,* 458 F.Supp.2d 68, 78 (E.D.N.Y. 2006) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001)). Though the Second Circuit "has never held a period of less than two years to constitute a 'substantial period of time,'" *DeFalco*, 244 F.3d at 320, the Complaint alleges RICO acts beginning in May 2004 (mailing the fraudulent deeds to the Register) and ending in June 2006 (mailing the second assignment to the Patent and Trademark Office), a period of just over two years. *See Metromedia v. Fugazy*, 983 F.2d 350, 369 (2d Cir. 1992) (erroneous instruction on continuity harmless where predicate acts found by the jury spanned two years, rather than weeks and months). During that time period, the RICO defendants allegedly sent fraudulent notices to at least three creditors regarding the status of their loans to Blue Ridge Farms, submitted fraudulent statements to at least two different courts, and filed fraudulent documents with at least three different government offices. Given this range of fraudulent activities, occurring over more than two years, and the fact that they impacted at least four creditors and possibly many more, plaintiff has sufficiently alleged closed-ended continuity in the Complaint.[63]

---

[63] Though the Second Circuit has cautioned courts against "artificially fragmenting a singular act into multiple acts simply to invoke RICO," *Schlaifer Nance & Co. v. Estate of Warhol* , 119 F.3d 91, 98 (2d Cir. 1997)**,** plaintiff's allegations indicate fraud against multiple parties through both the fraudulent conveyance of assets and the subsequent deceit of creditors and courts as to the status of those assets and creditors' debts, and accordingly allege an extensive and substantial fraud.

-43-

*Rule 9 Pleading Requirements*

Defendants also argue that plaintiff has failed to plead the predicate RICO acts of fraud (mail and wire fraud) with sufficient particularity, as required under Fed. R. Civ. P. 9.[64] *See First Capital Asset Management, Inc. v. Satinwood, Inc.,* 385 F.3d 159, 179 (2d Cir. 2004) ("[A]ll allegations of fraudulent predicate acts . . . are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).").

Under Rule 9, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) (citations omitted).  In addition, "[p]laintiffs asserting mail [or wire] fraud must also identify the purpose of the mailing within the defendant's fraudulent scheme." *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992); *see Schnell v. Conseco, Inc.,* 43 F.Supp.2d 438, 443 (S.D.N.Y. 1999).  Finally, a plaintiff alleging fraud must "allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

---

[64] Since the alleged predicate RICO acts of obstruction of justice are not "fraud," they need not be pled with particularity.

Plaintiff alleges the following acts of mail and wire fraud:
(1) faxing of the "New Note" to plaintiff during the course of
her earlier district court action on December 13, 2004; (2)
mailing of the fraudulent deeds to the Register on May 24, 2004;
(3) notifying L.M. Foods by mail on May 3, 2006 about the
fraudulent security agreements and Blue Ridge Farms' default; (4)
notifying Crown Credit by mail on February 11, 2005 about the
fraudulent security agreements and Blue Ridge Farms' default; (5)
mailing of the fraudulent assignments to the Patent and Trademark
office on June 22, 2005 and June 22, 2006; (6) mailing of the
fraudulent UCC-1 financing statement to the Register in November
2004, January 12, 2005, March 24, 2005 and June 20, 2005.  For
each of these mail and wire fraud allegations, the Complaint sets
out the specific dates the fraudulent statements were mailed or
faxed[65] and to whom they were sent.[66]  It is also reasonably
inferred from the Complaint which statements were fraudulent and
how they were fraudulent, as each of these mailed and faxed
documents contained information that was deceitful; it is to be
reasonably inferred that (1) the New Note contained a false due
date of December 31, 2005, while the original, valid note was

---

[65] The single exception is the first date of filing the UCC-1, which is
listed as "November 2004," though I find that date specific enough to give
defendants sufficient notice of the specific fraud alleged.

[66] The exception is the filing of the UCC-1 with the "Register" though,
as previously noted, it can be fairly inferred that plaintiff was referring to
the Secretary of State.

payable on demand; (2) the deeds contained fraudulent certifications about non-existent sales contracts; (3)&(4) the letters to L.M. Foods and Crown Credit referenced loans made to Blue Ridge which were never actually made; (5) the assignments mailed to the Patent and Trademark Office were never validly authorized by Blue Ridge Farms; and (6) the UCC-1 financing statement referenced and relied on a loan that was never made. Moreover, though it could have been stated more clearly, it is evident that these documents were sent as part of a scheme to render the assets of Blue Ridge Farms unrecoverable by creditors and to prevent creditors from recovering their debts; the letters to creditors encouraged them not to pursue their debts or to take settlements at a reduced amount, while the letters to government offices helped formalize the fraudulent transfer of assets. Further, while some of the allegations do not allege which specific "RICO defendant" committed the fraud by sending the document, it would be very difficult for plaintiff to know which of the 'corporate insiders' who were perpetrating the alleged fraud was actually behind each act of fraud at this stage of the litigation and, accordingly, it is appropriate to relax the requirement that a specific speaker be identified for each act in a case such as this where plaintiff has described the overall "nature and operation of the scheme in which the defendants are alleged to have participated." *Beth Israel Medical Center v.*

-46-

*Smith*, 576 F.Supp. 1061, 1070-71 (S.D.N.Y. 1983) (finding that "[i]n view of the complaint's detailed description of the defendants' scheme . . . the failure to describe particular letters or telephone calls is not fatal to the complaint."); *See Shapo v. Engle,* 1999 WL 1045086, at *13(N.D.Ill. 1999) ("[W]here the named defendants are corporate insiders or control the actions of an entity" the requirement that the specific defendants who performed each act be identified "may be relaxed, especially when the defendants are in a better position to know the extent of each defendant's participation in the complained conduct."); *see also DiVittorio v. Equidyne Extractive Indus. Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).[67]

Finally, a 'strong inference of fraudulent intent,' may be demonstrated "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128. The present Complaint supports a conclusion that the parties had both motive (defrauding creditors to maximize the value of the company to them) and opportunity (as the owners and chief investors of the company, they essentially controlled the operations of Blue Ridge Farms). Moreover, the Complaint also

---

[67] Defendants argue that plaintiff "presumably" must have known who sent her the fax with the "New Note." However, in her brief, plaintiff states that she is "unable to allege with more particularity which RICO defendant made which aspect of that decision."

alleges facts which, construed as true, indicate strong evidence
of conscious misbehavior by the RICO defendants, including
transferring of property for no consideration and the creation of
security agreements where no loans were ever made.  Accordingly,
plaintiff's Complaint has sufficiently pled the predicate acts of
mail and wire fraud with particularity.[68][69]

II. Motion for Summary Judgment

     Plaintiffs have moved for partial summary judgment, arguing
that the Chloe Defendants have explicitly and implicitly assumed
the debts of Blue Ridge Farms, including the debt owed to
plaintiff.


*Standard for Summary Judgment*

     Summary judgment is appropriate "[w]hen the record taken as
a whole could not lead a rational trier of fact to find for the
non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith
Radio Corp.*, 475 U.S. 574, 587 (1986).  Rule 56 of the Federal
Rules of Civil Procedure provides for summary judgment "if the
pleadings, depositions, answers to interrogatories, and

---

[68] To the extent defendants also argue that plaintiff has not alleged
reliance on the fraud, in each claim of fraud, the Complaint states that the
receiving party relied on the documents sent.  I do note however that the
nature of the 'reliance' with regards to plaintiff's receipt of the New Note
is not readily apparent, given that she clearly knew the New Note was false.

[69] Since defendants submitted these motions to dismiss in lieu of an
Answer to the Complaint, the Magistrate Judge is directed to establish a new
deadline for submission of defendants' Answer.

admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as matter of law." Fed.
R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S.
317, 322 (1986). "An issue of fact is genuine if the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party." *Elec. Inspectors, Inc. v. Vill. of E. Hills*,
320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it
"might affect the outcome of the suit under the governing law."
*Id.*

The party seeking summary judgment has the burden of
demonstrating that no genuine issue of material fact exists.
*Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In
order to defeat such a motion, the non-moving party must raise a
genuine issue of material fact. Although all facts and
inferences therefrom are to be construed in the light most
favorable to the non-moving party, the non-moving party must
raise more than a "metaphysical doubt" as to the material facts.
*See Matsushita*, 475 U.S. at 586; *Harlen Assoc. v. Vill. of
Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). "[A]n adverse party
may not rest upon the mere allegations or denials of the adverse
party's pleading, but . . . must set forth specific facts showing
that there is a genuine issue for trial." Fed. R. Civ. P 56(e).
The non-moving party may not rely on conclusory allegations or

unsubstantiated speculation. *Twin Labs., Inc., v. Weider Health &*
*Fitness*, 900 F.2d 566, 568 (2d Cir. 1990); *Kulak v. City of New*
*York*, 88 F.3d 63, 71 (2d Cir. 1996) ("conclusory statements,
conjecture, or speculation by the party resisting the motion will
not defeat summary judgment"); *Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 251 (1986); *Niagara Mohawk Power Corp. v. Jones*
*Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).


*Successor Liability*

In New York, "when one corporation sells or otherwise
transfers all its assets to another company," the purchaser of an
asset is only liable for the debts of the seller: where

> (I) the purchaser expressly or impliedly agrees to
> assume such debts or liabilities; (ii) the transaction
> amounts to a de facto merger or consolidation of the
> seller and purchaser; (iii) the purchasing corporation
> is a mere continuation of the selling corporation; or
> (iv) the transaction is entered into fraudulently to
> escape liability for such obligations.

*Miller v. Forge Mench Partnership Ltd.,* 2005 WL 267551, at *6
(S.D.N.Y. 2005). According to plaintiff, the Chloe Defendants
have both expressly and impliedly assumed the obligations of Blue
Ridge Farms.[70]

Assuming, *arguendo*, that plaintiff has sufficiently
demonstrated that Blue Ridge Farms transferred *all its assets* to

---

[70] Since plaintiff only alleges an express and implied assumption of
obligations, I do not address the other potential grounds for demonstrating
successor liability.

the Chloe Defendants,[71] she has failed to demonstrate that there
is no issue of material fact as to the Chloe Defendants' express
and implied assumption of Blue Ridge Farms' obligations.

Plaintiff relies primarily on what she deems an express
admission in defendants' briefs in this matter. *See Purgess v.
Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("A court can
appropriately treat statements in briefs as binding judicial
admissions of fact").  In defendants' First Motion to Dismiss
(filed after the Original Complaint and withdrawn after the
Amended Complaint was served), defendants, in arguing that there
was insufficient fraudulent scienter alleged in the Complaint,
state that "the Chloe Defendants assumed the obligations of Blue
Ridge and have continued to operate the business." First Motion
to Dismiss, p.11.  However, the defendants, in a earlier footnote
to that motion, specifically state that

> As a Rule 12(b)(6) motion requires, the Chloe
> Defendants, solely for the purposes of this motion,
> take the plaintiff's allegations as true.  The Chloe
> Defendants vigorously dispute the letter and tenor of
> the plaintiff's allegations and will demonstrate their
> complete lack of factual merit at the appropriate time
> and in the appropriate forum.

First Motion to Dismiss, n.5.  Accordingly, while the language on
page 11 may have been inartful, it appears clear that defendants

---

[71] The Chloe Defendants argue that the transactions were stock
purchases, rather than the transfer of assets from one company to another, and
therefore successor liability does not apply.  In support of this contention,
defendants have submitted a copy of a letter setting forth the terms of the
agreement for Kontogiannis's "purchase of shares" of Blue Ridge Farms stock.
Chloe Defendants' Exhibit 1.

statement that "the Chloe Defendants assumed the obligations of Blue Ridge" was not an admission but rather merely reflected the Complaint's allegations that Chloe Foods, Inc., assumed all debts of Blue Ridge Farms pursuant to the August Stock Purchase Agreement, which defendants' brief itself references on page 6.[72] *See Marathon Enterprises, Inc. v. Schroter GMBH & Co.,* 2003 WL 355238, at *4 (S.D.N.Y. 2003) (finding that a denial of liability in one part of defendant's answer and apparent admission in another is clearly result of "inadvertent mistake" and will not be construed as an admission of liability.).

Plaintiff also argues that two affidavits filed by attorneys working for the Chloe Defendants in the Goldberg action, referred to above, imply that the Chloe Defendants had assumed the debts of Blue Ridge Farms. However, no such implication is warranted. The first affidavit, filed by Maria Katisivela, in-house counsel for Blue Ridge Farms, states that June and Seymour Siegel "sold their interest in the company, and I (along with most everyone

---

[72] Plaintiff, in her reply brief, notes that the sentence in the brief following the one quoted reads "Kontogiannis has continued to spend money to make the business viable and the Siegel Son Defendants have continued to operate the business" and that are no such allegations in the Complaint, indicating that defendants on page 11 were not simply reflecting the Complaint but were rather making factual admissions. However, it appears to me that defendants, who adhered closely to the allegations in the Complaint throughout their brief, were merely making a perhaps unwarranted conclusion when they referred to Kontogiannis and the Siegel brothers, perhaps in reference to the fact that the Complaint alleges that Jeffrey Siegel took a job with Kontogiannis and that Kontogiannis continued to pay for the shares of June and Seymour Siegel and offered to settle with L.M. Foods. Moreover, even if plaintiff was making an admission of fact in the second sentence, I am still convinced that the previous sentence was only referencing the Complaint's allegation that Chloe Foods, Inc., assumed the debts of Blue Ridge Farms in the August agreement.

else here) came aboard and constitute new management at Blue

Ridge Farms." Plaintiff's Exhibit E.  The affidavit continues and

states that the new management thereafter learned that the

Siegels had defrauded the "new owners" and that the new owners

had been working hard to rectify the situation.  At most, this

affidavit implies that a share of the assets of the company had

been transferred to new owners.  It does not in any way imply

that the new owners agreed to assume the debt.  The second

affidavit was filed by Robert Wolf, outside counsel for Blue

Ridge Farms, in which he states that "new management was still in

the process of fully familiarizing itself with the new company."

Plaintiff's Exhibit D.  Again, while this may demonstrate that

there was indeed some transfer of assets, it in no way implies

that a successor corporation agreed to assume the debts of Blue

Ridge Farms.[73][74]

---

[73] In plaintiff's reply brief, she notes that defendants, in the section of their brief on this motion titled "Counterstatement of Facts" has stated that sometime after the initial stock sale to Kontogiannis, "Kontogiannis and the Siegel Sons each sold their respective stock to Chloe Foods, Inc., which became the sole shareholder in the Company." Defendants' Summary Judgment Brief, p.3.  Plaintiff has attached a copy of an agreement to her reply brief, purporting to be this very same agreement to sell the stock to Chloe Foods, Inc. Plaintiff's Reply Exhibit B.  In that document, Chloe Foods, Inc., agrees to assume all debts of Blue Ridge Farms.  Accordingly, plaintiff argues that partial summary judgment should granted at least as to Chloe Foods, Inc.'s obligation to repay the debts of Blue Ridge Farms.  However, since this argument and evidence was in plaintiff's reply brief for the first time, and defendants have not had an opportunity to challenge the authenticity or meaning of the document, I will not consider this argument at this time, though plaintiff is free to raise this issue in a future motion. *See Playboy Enters., Inc. v. Dumas*, 960 F.Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court.").

[74] Defendants, in their response papers to the summary judgment motion, have requested that I issue an Order to Show Cause why sanctions under Fed. R. Civ. P. 11 should not be imposed due to plaintiff's alleged misrepresentations

### Conclusion

For the reasons set forth above, defendants' motions to dismiss are denied and plaintiff's motion for partial summary judgment is denied.  The Clerk is directed to transmit a filed copy of the within to all parties and the Magistrate Judge.

SO ORDERED.

Dated :    Brooklyn, New York
           July 24, 2007

                    By: <u>/s/ Charles P. Sifton (electronically signed)</u>
                         United States District Judge

---

of both factual matters and legal precedent in the motion for summary
judgment.  An Order to Show Cause to that effect has been filed today and the
parties are directed to that Order for information on further proceedings.