UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X

SHERRILL BONDER ROTHBERG,

                              Plaintiff,

          - against -

CHLOE FOODS CORPORATION, a/k/a CHLOE
FOODS MANUFACTURING; CHLOE FOODS, INC.,
d/b/a BLUE RIDGE FARMS, INC.; CHLOE FOODS          06-CV-5712
S.A.; BRF ACQUISITION, LLC; 3301 ATLANTIC          (CPS)(KAM)
AVENUE, LLC; GREENVALE FINANCIAL CENTER,
INC.; ANPERG, INC.; BLUE RIDGE FARMS               MEMORANDUM
(ILLINOIS), INC.; THOMAS KONTOGIANNIS;             OPINION AND
ANNETTE APERGIS; NICK TISINENKIAS; JEFFREY         ORDER
SIEGEL; RICHARD SIEGEL; JUNE SIEGEL; JUNE
SIEGEL in her Capacity as Personal
Representative of the ESTATE OF SEYMOUR
SIEGEL; JOHN AND JANE DOES 1 through 10;
and ABC CORPS. 1 through 10,

                              Defendants.

-------------------------------------------X

SIFTON, Senior Judge.

     Plaintiff Sherrill Bonder Rothberg commenced this action in

October 2006 against corporate defendants Chloe Foods

Corporation, a/k/a Chloe Foods Manufacturing; Chloe Foods, Inc.,

d/b/a Blue Ridge Farms, Inc.; Chloe Foods S.A.; BRF Acquisition,

LLC; 3301 Atlantic Avenue, LLC; Greenvale Financial Center, Inc.;

Anperg, Inc.; and Blue Ridge Farms (Illinois), Inc. ("Corporate

Defendants"); and against individual defendants Thomas

Kontogiannis; Annette Apergis; Nick Tisinenkias; Jeffrey Siegel;

Richard Siegal; and June Siegal both individually and in her

capacity as personal representative of the estate of Seymour

Siegel (the "Individual Defendants").[1]

According to plaintiff's amended complaint ("Amended Complaint"), defendants defrauded her in order to avoid payment of a debt owed by Blue Ridge Farms, Inc. ("Blue Ridge Farms") and of a judgment[2] subsequently obtained pursuant to that debt ("Blue Ridge Judgment"). Specifically, plaintiff claims that (1) Kontogiannis, Apergis, Jeffrey Siegel, and Richard Siegel fraudulently transferred the assets of Blue Ridge Farms through a pattern of racketeering activity in order to avoid their obligation to plaintiff and other creditors, in violation of RICO, 18 U.S.C. § 1962 *et seq.*;[3] (2) the Corporate Defendants became successors to Blue Ridge Farms and are liable for its debts, including the Blue Ridge Judgment; (3) all defendants fraudulently transferred assets in violation of New York Debtor and Creditor Law §§ 273, 274, 275 and 276; (4) all defendants breached their contractual obligations to plaintiff; (5) the Individual Defendants breached their fiduciary duties to plaintiff; and (6) all defendants unjustly enriched themselves at

---

[1] The Amended Complaint also names as defendants John and Jane Does 1 through 10 and ABC Corporations 1 through 10, though there are no allegations in the Amended Complaint directed at these unidentified defendants.

[2] In an action filed in this district, plaintiff was awarded a default judgment in the amount of $915,833.32 against Blue Ridge Farms. *See Rothberg v. Blue Ridge Farms, Inc.*, 04-CV-3986.

[3] This is the only basis for federal jurisdiction in this matter. Diversity jurisdiction is not available since both plaintiff and June Siegel are Florida residents. On July 25, 2007, I denied defendants' motion to dismiss the RICO claims pursuant to Fed. R. Civ. P. 12(b)(6).

the expense of plaintiff.[4]

Plaintiff now alleges that after a series of settlement conferences before the Magistrate Judge and negotiations thereafter between the parties, a settlement was reached, which defendants breached.  Now before this Court are plaintiff's applications for: 1) an order of attachment; 2) a preliminary injunction restraining defendants from transferring assets pending the entry of the Court's decision on plaintiff's application for enforcement of the purported settlement agreement between the parties; and 3) enforcement of the settlement agreement and entry of final judgment against the Corporate Defendants.  Based on the findings of fact and conclusions of law set forth below, the applications are denied.

## Background

What follows sets forth the findings of fact and conclusions of law on the basis of which these applications are decided, which are derived from the underlying allegations in plaintiff's Complaint and affidavits submitted by plaintiff and defendants in connection with these applications.  Disputes are noted.

Plaintiff brought this action to, *inter alia*, enforce and

_____

[4] The Amended Complaint also lists a claim titled "claim for piercing the corporate veil/alter ego."  However, this appears not to be an independent cause of action but rather a theory of liability as to why the Individual Defendants should be liable for any judgment against the Corporate Defendants on the remaining causes of action.  *See 9 East 38th Street Associates, L.P. v. George Feher Associates, Inc.,* 640 N.Y.S.2d 520, 521 (N.Y.App.Div. 1996) ("a separate cause of action to pierce the corporate veil does not exist independent from the claims asserted against the corporation.").

collect the Blue Ridge Judgment.  By way of this action, plaintiff sought to assert the Blue Ridge Judgment against the assets of the Corporate Defendants, various entities she alleges are incarnations of Blue Ridge Farms, and the Individual Defendants, who she alleges control the Corporate Defendants. The Individual Defendants include Thomas Kontogiannis and Annette Apergis, Kontogiannis' daughter and the Chief Financial Officer and Chairwoman of the Board of Chloe Foods Corp., as well as other former or current officers of the Corporate Defendants. Plaintiff also sought to reverse various alleged fraudulent conveyances of Blue Ridge Farms' assets and recover damages against the various defendants for their involvement in what plaintiff alleges was a conspiracy to defraud plaintiff and other creditors of Blue Ridge Farms.

On October 16, 2007, prior to the commencement of deposition discovery in this matter, the parties appeared before the Magistrate Judge for a settlement conference.  At the conference the case did not settle, but the plaintiff, and defendants Kontogiannis and Apergis, all of whom were present, participated in negotiations seeking a settlement.  Kontogiannis asserted that defendant Chloe Foods Corporation ("Chloe Foods") was not able to pay plaintiff's entire claim all at once and that if there were to be a settlement, plaintiff would have to be paid over time. Defendants further assured Plaintiff that if she agreed to such a

proposal, adequate collateral security would be provided.
Kontogiannis stated that Chloe Foods had unencumbered equipment
of significant value that could be used to secure her claim for
payment.  The case did not settle at this conference, but the
parties agreed to continue negotiating through their counsel.

On October 30, 2007, the parties again appeared before the
Magistrate Judge, by telephone conference.  On November 12, 2007,
an agreement on several of the terms of a settlement was reached.
On November 20, 2007, plaintiff's counsel emailed defendants'
counsel, noting he was working "on a draft Stipulation and Order
for Settlement to reflect the settlement terms."  Falanga Cert.,
Ex. A (Nov. 20, 2007, 2:49 P.M. E-Mail from S. Falanga to J.
Fornari).  In this e-mail, Mr. Falanga, plaintiff's counsel, set
forth the terms of the settlement as he understood them as
follows:

- $800,000 settlement amount paid as follows:
  - $250,000 cash upon signing of agreement no later than December 15th, 2007
  - $550,000 over three years with monthly interest payments at 10% (we propose to be due on the first of each calendar month)
  - $61,111 to be paid on the first of each of the following months: July, August and September of 2008, 2009 and 2010.
- A first priority security interest in equipment to be named that would have a value exceeding the amount of settlement obligation and a lien on the companies' trademarks and intellectual property.
- Confessions of Judgment from each of the corporate defendants for the full amount of the judgment plus post-judgment interest, which plaintiff could seek to enforce in the event of a default
- A right to collect attorney's fees in the event of a

- Mutual general releases between all parties that would be held in escrow pending completion of the payments provided that the RICO claim would be released upon the payment of the $250,000 at signing.
- A tolling agreement to preserve statute of limitation issues for the non-RICO claims in the complaint [to permit] plaintiff . . . to reinstitute suit [in the event] of a default.
- [Retention of jurisdiction in the] District Court . . . to enforce the terms of the settlement and . . . dismiss[al of the case] without prejudice to become with prejudice upon completion of the payments.

*Id.* Counsel's e-mail continued:

As you know, the settlement is conditioned upon my client's satisfaction that the proposed collateral is sufficient to secure the amounts due under the settlement. We are working on preparing draft settlement documentation and once your clients have identified the collateral and the representations as to ownership and no liens etc, I will forward the draft agreement to you for your review. Until we are satisfied with the collateral, however, expending time and resources in formalizing and finalizing the settlement is premature.

In light of the holiday week, we ask that by Monday you identify the collateral subject to our client's lien. In light of the pending Court deadlines on completion of fact discovery, if we do not hear from your clients by Monday, we will have no choice but to resume discovery and reserve all rights. . .

*Id.* Mr. Fornari, defendants' counsel, e-mailed later that

afternoon:

When we last spoke, you said you would have the settlement documents drafted while we were getting the equipment information to you... please do not now start with the "expending time and resources in formalizing and finalizing the settlement documents is premature." [sic] posturing.

Also, the 10% is on the outstanding balance, not on the 550K for three years

Payment should be in the middle of each month

5 business day cure period

I have no idea what you mean by "once your clients have identified the collateral **and the representations as to ownership and no liens etc**," the reps are going to be in the settlement document/they are not giving you separate reps/ [sic]

I should have the full document in electronic format this evening and I will forward...

Falanga Cert., Ex. B (Nov. 20, 2007, 3:17 P.M. E-Mail from J. Fornari to S. Falanga and R. Wolf (emphasis in original)).  Mr. Falanga responded:

I am not posturing – as we discussed we are drafting the Stipulation and Order for Settlement and related documents. Yes on the 10%; the monthly interest will decrease as the principal balance decreases.  That is how we are setting it up.
Payment by the 15th of the month is fine as is the 5 business day cure period.
The reps and warranties will be contained in the settlement agreement and security document.  I did not envision separate reps other than what will be in the settlement document so I don't know what your concern is but your clients must represent they own the collateral and it is not the subject of any prior lien.
I will revert back after I receive the collateral info. . .

Falanga Cert., Ex. C (Nov. 20, 2007, 3:35 P.M. E-Mail from S. Falanga to J. Fornari).

On November 21, 2007, Mr. Fornari forwarded to plaintiff's counsel a 75-page appraisal of Chloe Foods machinery and equipment with a represented liquidation value of between $3 million and $4 million.  *See* Falanga Cert., Ex. D (Nov. 21, 2007, 2:19 P.M. E-Mail from J. Fornari to S. Falanga).  Plaintiff's counsel thereafter requested additional documents to verify

ownership and secure plaintiff's lien, including certificates of title for approximately eighteen Box Trucks and other trailers listed in the appraisal. Falanga Cert., Ex. E (Nov. 29, 2007, 1:16 P.M. E-Mail from S. Falanga to J. Fornari).

On December 7, 2007, plaintiff's counsel forwarded certain settlement documentation to Mr. Fornari by e-mail. Falanga Cert., Ex. F (Dec. 7, 2007, 4:28 P.M. E-Mail from S. Falanga to J. Fornari). The draft documents provided for payment of the initial $250,000 only upon execution of the Stipulation. Wolf Aff., Ex. 1. In his e-mail, Mr. Falanga also reiterated that he needed to receive copies of the certificates of titles for the Box Trucks and trailers listed in the appraisal. Mr. Falanga noted, "it is imperative that we resolve the collateral issue next week as our intention was that the initial payment be made by December 15th and we cannot bring closure to this matter until we are satisfied with the collateral that is being offered." *Id.* Mr. Fornari responded, on December 12, 2007, that he was reviewing the settlement documents and that he had asked Chloe Foods to confirm its title to the collateral and the lack of any encumbrances. Falanga Cert., Ex. G (Dec. 12, 2007, 12:36 P.M. from J. Fornari to S. Falanga). Mr. Fornari also stated, "With regard to the December 15 date, that is a Saturday/ we will try to get this closed out this week, but you just sent over the documents on Friday and we have to review them." *Id.*

By a December 14, 2007, e-mail, Mr. Falanga provided the necessary information for the Corporate Defendants to wire the initial payment of $250,000. Falanga Cert., Ex. H (Dec. 14, 2007, 11:51 A.M. E-Mail from S. Falanga to J. Fornari). Mr. Falanga also again requested the truck titles and explained plaintiff's wish to verify Chloe Foods' ownership and the absence of liens via such documentation. *Id.*

No payment was made on December 15, 2007. On December 19, 2007, counsel for the parties spoke and Mr. Fornari promised again to obtain title for the trucks at issue as well as the documents establishing ownership of other equipment. Falanga Cert. at ¶ 17. Mr. Fornari also promised to inquire whether the Corporate Defendants would forward the initial $250,000.

On December 21, 2007, Mr. Falanga e-mailed Mr. Fornari. Falanga Cert., Ex. I (December 21, 2007, 3:45 P.M. E-Mail from S. Falanga to J. Fornari). He stated he was still waiting for the certificates of title for certain vehicles as well as evidence that other equipment offered as collateral for the balance of the $800,000 was owned by Chloe Foods. *Id.* He also noted that defendants' had not made the $250,000 payment which Mr. Falanga had agreed to hold in the firm's escrow account until the settlement documentation was signed. *Id.* He concluded, "If we do not receive the down payment and collateral documentation we will presume your clients do not intend to comply with the

settlement and will have no choice but to alert the Court of this fact, resume discovery and reserve all rights." *Id.* Mr. Fornari replied on December 26, 2007, that he would follow-up and respond the following day. Falanga Cert., Ex. J (Dec. 26, 2007, 6:52 P.M. from J. Fornari to S. Falanga).

On December 27, 2007, counsel for the parties spoke. Counsel for the Corporate Defendants advised that the Corporate Defendants needed only a few more days to provide the requested titles to the trucks. Falanga Cert. ¶ 20. Counsel for the Corporate Defendants also stated that they needed only one or two more days to obtain the $250,000 payment. *Id.* Further, they also disclosed that certain of the trucks offered as collateral in November had been "swapped" for other trucks as part of a capital lease financing and were no longer available as collateral. *Id.* Certain truck titles that had been in Corporate Defendants' counsel's office were taken back by Ms. Apergis after a meeting. *Id.*

Also during this conversation, plaintiff's counsel discussed the results of UCC-1 Financing Statement Lien searches plaintiff had conducted, which showed an existing UCC-1 Financing Statement in the name of Sanderson State Bank held a lien on "all assets" of Chloe Foods. Falanga Cert. ¶ 21. Plaintiff's counsel advised Mr. Fornari that it was plaintiff's understanding that Sanderson State Bank was controlled or owned by Annette Apergis and that

the Financing Statement would have to be discharged or amended to grant plaintiff the first lien on the equipment. *Id.*

Mr. Fornari requested until January 2, 2008 to deal with the issues raised. *Id.* at ¶ 22. He also advised plaintiff's counsel that he had no issues with respect to the substance of the settlement documentation, but did have comments regarding certain wording. *Id.* After the conversation, Mr. Fornari e-mailed his comments on the settlement papers. While the changes were generally minor, Mr. Fornari's changes did impose limitations upon plaintiff's right to seek attorney fees and to reinstitute her RICO claim. Falanga Cert., Ex. K (December 27, 2007, 4:36 P.M. E-Mail from J. Fornari to S. Falanga); Falanga Cert., Ex. L (Chloe Foods comments to Stipulation and Order of Settlement and Dismissal). Mr. Falanga never responded to these comments.

Also after this conversation, and after receiving Mr. Fornari's comments to the settlement papers, plaintiff's counsel set out his understanding of the discussion in an e-mail. Falanga Cert., Ex. M (Dec. 27, 2007, 6:18 P.M. E-Mail from S. Falanga to J. Fornari). He further stated he would review Mr. Fornari's changes to the Stipulation and "let [him] know if I have any issues." *Id.* Mr. Fornari replied by e-mail with minor clarifications, including that he said defendants "should" not "would" have the initial $250,000 available within one to two days. Falanga Cert., Ex. N (Dec. 27, 2007, 6:26 P.N. E-Mail from

S. Falanga to J. Fornari).

On January 2, 2008, plaintiff's counsel spoke with Mr. Fornari. Mr. Fornari advised Mr. Falanga that Chloe Foods had entered into a loan transaction and closed on the first portion on December 31, 2007, under which Chloe Foods was pledging all of its assets to a lender whose name would not be disclosed. Falanga Cert. ¶ 27. As a result, Mr. Fornari indicated that it was questionable whether plaintiff would obtain the requested collateral. *Id.* He also stated that the Corporate Defendants would try to raise $600,000 to $650,000 in a lump sum to pay plaintiff to resolve the matter within 21 days. *Id.*

Plaintiff refused to accept this revised offer. Falanga Cert., Ex. O (January 3, 2008, 2:24 P.M. E-Mail from S. Falanga to J. Fornari). Plaintiff's counsel asserted:

> The Defendants have the right under our settlement to prepay the amount due in full at any time. Accordingly, if your clients now wish to avoid their obligation to provide the security required under our settlement agreement they may do so by immediately tendering the full amount due of $800,000 . . . Alternatively, a letter from you to me stating you are holding the $800,000 settlement amount in your escrow account pending the filing of the Stipulation with the court will be satisfactory.

*Id.* Plaintiff's counsel requested that defendants respond by January 4, 2008 whether they intended "to honor the settlement agreement." *Id.* Otherwise, plaintiff's counsel advised, plaintiff would file a motion to enforce the settlement. *Id.*

Thereafter, Corporate Defendants offered to determine

whether the entire $800,000 could simply be paid up front, or
whether $600,000 could be paid, with the balance to be paid with
interest in the summer of 2009, with modified collateral that
would secure this lesser amount. Falanga Cert. ¶ 30. Corporate
Defendants also indicated that the lender in the loan transaction
would allow the $250,000 to be wired into plaintiff's counsel's
firm's trust account while it attempted to raise the remaining
$350,000 within 21 days. Falanga Cert. ¶ 31. Counsel for the
Corporate Defendants insisted, however, that the $250,000 would
have to be returned if the $350,000 could not be raised.
Plaintiff refused to accept this offer. *Id.*

On January 10, 2008, Mr. Fornari called Mr. Falanga and
advised that no collateral was available to secure any obligation
to plaintiff. Falanga Cert. ¶ 32. He stated he had received the
certificates of title from his client and that, except for four
trucks of minimal value, each truck previously offered as
collateral was already subject to a preexisting lien separate and
apart from the lien of the unidentified lender. *Id.*

On January 18, 2008, defendants' counsel notified plaintiff
that the lender to Chloe Foods had agreed to allow plaintiff a
first position with regard to all of Chloe Foods' assets, and
attached a list of these assets. Wolf Aff., Ex. 1. Counsel also
notified plaintiff that defendants were now in a position to
consummate the terms of settlement contemplated in November 2007.

*Id*.  Plaintiff rejected this offer.  Wolf Aff., Ex. 4.

In February 2007, Kontogiannis pleaded guilty to one count of money laundering for using his family's mortgage company to channel more than $1 million in bribes to pay of a former Congressman.  Falanga Cert., Ex. P (Nov. 28, 2007 North County Times article).  The article also quoted Robert Wolf, one of Kontogiannis' attorneys in this case, as stating he has made arrangements to use Kontogiannis' holdings to cover approximately $100 million in losses that a handful of banks could suffer as a result of unrelated mortgage fraud engaged in by Kontogiannis.

**Discussion**

I.  Attachment

Fed. R. Civ. P. 64 provides:

> (a)  At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment.  But a federal statute governs to the extent it applies.
> (b) The remedies under this rule include the following . . . attachment.

New York law provides for attachment as follows:

> An order of attachment may be granted in any action, except a matrimonial action, where the plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more defendants, when:  . . .
> (3) the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts . . .

N.Y.C.P.L.R. ("C.P.L.R.") § 6201(3) (McKinney 2007). C.P.L.R. §

6212 sets forth the standard governing issuance of orders of

attachment:

> On a motion for an order of attachment . . . the
> plaintiff shall show, by affidavit and such other
> written evidence as may be submitted, that there is a
> cause of action, that it is probable that the plaintiff
> will succeed on the merits, that one or more grounds
> for attachment provided in section 6201 exist, and that
> the amount demanded from the defendant exceeds all
> counterclaims known to the plaintiff.

C.P.L.R. § 6212(a). Prejudgment attachment is a provisional

remedy to secure a debt by preliminary levy upon the property of

the debtor in order to conserve that property for eventual

execution. Because attachment is a harsh remedy, the statute

must be strictly construed in favor of those against whom it may

be applied. *See Michaels Elec. Supply Corp. v. Trott Elec. Inc.*,

231 A.D.2d 695 (2d Dep't 1996); *P.T. Wanderer Assoc., Inc. v.*

*Talcott Communications, Corp.*, 111 A.D.2d 55 (1st Dep't 1985).

Moreover, the granting of prejudgment attachments is

discretionary, "'and even when the statutory requisites are met,

the order may be denied.'" *Elliott Assoc., L.P. v. Republic of*

*Peru,* 948 F. Supp. 1203, 1211 (S.D.N.Y. 1996) (quoting

*Filmtrucks, Inc. v. Earls*, 635 F. Supp. 1158, 1162 (S.D.N.Y.

1986)).

Plaintiff has as causes of action the claims for relief set

forth in the Amended Complaint. Plaintiff also now asserts that

defendants' breach of the purported settlement agreement is a

separate cause of action.  Further, defendants have asserted no
counterclaims.  Thus, the first and fourth requirements of §
6212(a) are satisfied.  I turn to the second requirement.

Plaintiff makes no attempt in the papers on these
applications to demonstrate her probable success on the merits on
any of the claims for relief in her Amended Complaint.  Instead
she argues that she will succeed in demonstrating the parties
entered into a settlement agreement entitling her to final
judgment against the Corporate Defendants in the amount of
$915,833.32, plus post-judgment interest figured form August 31,
2005, plus attorney's fees incurred by plaintiff in connection
with this application.

A settlement agreement is a contract that is interpreted
according to general principles of contract law.  *Powell v.
Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007).[5]  Under New York law,
a contract is valid if there is an offer and acceptance,
consideration, mutual assent, and an intent to be bound.
*Register.com v. Verio*, 356 F.3d 393, 427 (2d Cir. 2004).  Parties
may enter into a binding contract orally, and the intention to
commit an agreement to writing, standing alone, will not prevent

---

[5]  It is unclear whether the settlement of federal claims is governed
by New York law or federal common law.  In *Ciaramella v. Reader's Digest
Ass'n*, 131 F.3d 320 (2d Cir. 1997), the Second Circuit declined to decide this
question because New York law and federal common law were materially
indistinguishable. *Id*. at 322; see also *Monaghan v. SZS 33 Assocs*., 73 F.3d
1276, 1283 n. 3 (2d Cir. 1996) ( "[T]he federal rule regarding oral
stipulations does not differ significantly from the New York rule.").
Therefore, I  will apply New York and federal common law interchangeably.

contract formation. *Powell*, 497 F.2d at 129.

Defendants do not dispute that the parties agreed orally, on November 12, 2007, to the following terms of a settlement: discontinuance of the current litigation in exchange for a payment of $800,000, plus interest at 10%, over a 3-year period with a down payment of $250,000 and certain lump sum payments due thereafter to be secured by a first lien on equipment that would have a value in excess of the outstanding balance.

The settlement, however, was "conditioned upon [plaintiff's] satisfaction that the proposed collateral is sufficient to secure the amounts due under the settlement." Falanga Cert., Ex. A. Mr. Falanga continued, "[u]ntil we are satisfied with the collateral . . . formalizing and finalizing the settlement documents is premature." *Id*. It is clear that the provision of unencumbered collateral was a condition precedent to settlement as plaintiff had no intention to be bound by the settlement until she was satisfied with the collateral. Thus, there was no agreement. *See Coney Island Resorts, Inc. v. Giuliani*, 103 F. Supp.2d 645, 654-55 (E.D.N.Y. 2000) (finding no lease, or contract to enter into lease, where New York City told plaintiff no lease could be executed absent firm financial commitments and no such commitments were obtained), *aff'd* 11 Fed. Appx. 11 (2d Cir. Apr 18, 2001).

It is also clear that plaintiff was never satisfied with the

collateral offered.  On December 14, 2007, plaintiff's counsel
wrote, "I would like to know [the status of certain equipment
proposed as collateral] so that our client can determine [if] she
is satisfied with the collateral that is being offered."  Falanga
Cert., Ex. H.  On December 27, 2007, he wrote, "[I]t is
imperative that we resolve the remaining issues and submit the
Stipulation and Order . . . to the Court."  Falanga Cert., Ex.
M.[67]

Moreover, I note that even if there were an agreement, there
has been no default in payment, which is the only type of default
that would permit plaintiff to obtain the relief she presently
seeks.  Wolf Aff., Ex. A, ¶5; *see also* Falanga Cert., Ex. L, ¶5.
The written drafts of the settlement agreement called for payment
of the initial $250,000 only upon signing of the Stipulation and
Order of Settlement and Dismissal.  Wolf Aff., Ex. A, ¶2; *see
also* Falanga Cert., Ex. L, ¶2.[8]

---

[6] Defendants additionally contend that it was understood that no
settlement would be final and binding until the parties had reduced the
agreement to writing, with appropriate details and documentation.  In light of
my analysis above, I need not address this argument.

[7] If plaintiff had not required that she be satisfied with the
collateral prior to finalizing settlement, I would be persuaded by plaintiff's
argument that the November 12, 2007, oral agreement constituted an
enforceable, preliminary agreement since all that would have remained would
have been to memorialize the agreement in a formal document.  *See Adjustrite
Sys. v. GAB Bus. Servs.*, 145 F.3d 543, 547-48 (2d Cir. 1998).  Plaintiff's
citation to *Janneh v. GAF Corp.*, 887 F.2d 432, 436 (2d Cir. 1989) is
inapposite, as plaintiff in that matter did not subject his agreement to
settle on any condition precedents.

[8] Paragraph 5 of the draft settlement agreement contains the following
clause: "For the avoidance of any doubt, as of December 15, 2007, the total
amount due Rothberg under the Blue Ridge Farms Judgment is

-19-

As plaintiff has not demonstrated a probability of success
on her claim that defendants defaulted on an enforceable
settlement agreement, I need not consider whether grounds for
attachment pursuant to C.P.L.R. § 6201(3) exist.  I note,
however, that defendants' actions since November 12, 2007, raise
substantial questions as to whether defendants are not continuing
to engage in a scheme to defraud not unlike that alleged in the
Amended Complaint.  Nevertheless, for the reasons set forth
above, plaintiff's application for an attachment must be denied
without prejudice to an application for such provisional relief
to which plaintiff may be entitled.

II.  Preliminary Injunction

Plaintiff asks the court to issue a preliminary injunction
under Rule 65 enjoining defendants from selling, pledging,
assigning or otherwise disposing of any assets that may be
subject to a lien pursuant to an entry of judgment entered in
favor of plaintiffs, so that defendants may not avoid paying a
potential judgment in plaintiff's favor.

Pursuant to Federal Rule of Civil Procedure 65(a), a
preliminary injunction is appropriate if the movant shows (a)
irreparable harm in the absence of an injunction and (b) either
(1) likelihood of success on the merits or (2) sufficiently
serious questions going to the merits to make them a fair ground

---

$_____."  This blank was never filled in.

for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Gold v. Feinberg*, 101 F.3d 796, 800 (2d Cir. 1996).

Again, plaintiff has made no reference to the claims in her Amended Complaint to demonstrate that she satisfies these requirements. Instead, she relies on her claim that defendants defaulted on the terms of an enforceable settlement agreement. For the reasons set forth in Section I, *supra*, plaintiff has not demonstrated either a likelihood of success on the merits or the existence of sufficiently serious questions going to the merits with regard to this claim. Accordingly, based on the above findings of fact and conclusions of law, and as set forth in the accompanying order, plaintiff's motion for a preliminary injunction is denied without prejudice.

### III. Enforcement of Settlement and Entry of Judgment

For the reasons set forth in Section I, *supra*, plaintiff's application that I enforce the settlement agreement and enter final judgment in the amount of the Blue Ridge Judgment, plus post-judgment interest from August 31, 2005, and attorneys' fees in connection with this application, is denied.

### Conclusion

Plaintiff's applications for an attachment of defendants' assets, a preliminary injunction, enforcement of settlement and entry of judgment are denied. The Clerk is directed to transmit

a copy of the within to all parties and the assigned Magistrate

Judge.

SO ORDERED.

Dated :  Brooklyn, New York
        January 29, 2008

                    By: /s/ Charles P. Sifton (electronically signed)
                          United States District Judge